## GENERAL MOTORS CORPORATION, DETROIT DIESEL ALLISON DIVISION, Appellant,

v.

## Les ASPIN, Secretary of Defense, Appellee.

Nos. 93–1352, 93–1417.

United States Court of Appeals, Federal Circuit.

April 29, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied and Declined June 9, 1994.

conceal that possibility from this Court." This

possibility was confirmed at oral argument.

Clarence T. Kipps, Jr., Atty., Miller & Chevalier, Chartered, Washington, DC, argued for appellant. Also on the brief were John C. Thede, Norman R. Thorpe, and W. Eric Pedersen, of General Motors Corp. and Robert K. Huffman, Alan C. Brown, Kevin C. Dwyer, and Willard L. Boyd, of Miller & Chevalier, Chartered, of counsel.

Domenique Kirchner, Atty., Dept. of Justice, Washington, DC, argued for appellee. With her on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director.

Before NIES, NEWMAN, and RADER, Circuit Judges.

RADER, Circuit Judge.

The Armed Services Board of Contract Appeals (ASBCA) sustained the Government's claim for a downward price adjustment on contracts with General Motors Corporation (GM). The ASBCA also denied GM's claim for a retroactive accounting practice change. *General Motors Corp.*, 93–2 B.C.A. (CCH) ¶ 25,753 (1993). Because Cost Accounting Standard (CAS) 403 requires direct allocation of home office expenses, this court reverses. Additionally, because GM violated disclosure obligations, this court remands for a determination of damages.

## BACKGROUND

The Department of Defense awarded Detroit Diesel Allison Division (DDAD) of GM several fixed price and cost contracts for the engineering and manufacture of transmissions and gas turbine engines. At all pertinent times for this suit, GM had eleven segments in the state of Indiana, including DDAD in Indianapolis (DDAD–I).

Because DDAD–I's defense contract exceeded $100,000, CAS, 4 C.F.R. §§ 400–420,[1] apply. 50 U.S.C. app. § 2168(g) (1970 & Supp. V 1975). These standards, CAS 403 in particular, required a home office making central payments on behalf of its segments to allocate directly to the segment that part of the payment specifically identified with the segment. CAS 403.40(b)(4), 4 C.F.R. § 403.-40(b)(4) (1992). Central payments include state income taxes.

Therefore, because it paid state taxes for DDAD–I, GM had to allocate those costs to DDAD. Those allocated payments appear as costs in GM's contracts with the Department of Defense (DOD). Before the ASBCA and on appeal to this court, DOD argues that GM allocated too many costs to DDAD–I and therefore contract payments should be adjusted downward. GM conversely argues that the allocation standards require an increase in contract payments.

*Indiana Taxes*

Indiana required corporations to pay three state income taxes, the Gross Income Tax (GIT), the Adjusted Gross Income Tax (AGIT), and the Supplemental Corporation Net Income Tax (SNIT). GIT taxed the "gross income derived from activities or businesses or any other source within the state of Indiana." Ind.Code § 6–2–1–2 (1972). GIT assessed taxes on gross receipts from the sale of products in Indiana without regard to whether GM had an overall loss or net income for the year. GIT revenues, as undedicated revenues, enriched the State General Fund. Of the three taxes, GM could directly allocate only GIT to its defense segment.

AGIT taxed "that part of the [corporation's] adjusted gross income derived from sources within the State of Indiana." Ind. Code § 6–3–2–1 (1972). The basis for GM's AGIT was the amount of its federal adjusted gross income generated in Indiana. AGIT revenues enriched a property tax relief fund. GM could not directly allocate its AGIT payments to its defense segment because this tax on GM's corporation-wide revenue was not specifically identified with DDAD–I.

SNIT taxed a corporation's net income derived from sources in Indiana. Ind.Code § 6–3–8–1 (1972). Neither GM nor DOD dispute the allocation of SNIT taxes. Rather this dispute focuses on the relationship between Indiana GIT and AGIT taxes in the context of federal accounting standards.

The Indiana Tax Code grants corporations a credit against AGIT:

> Corporations shall be entitled to a credit, not to exceed the amount of the ... [AGIT], against the ... [AGIT] in an amount equal to any tax imposed on gross income by [GIT] ... for the same taxable year.

Ind.Code § 6–3–3–2 (1972). Indiana Circular IT–10, Revised, entitled "Corporate Income Tax Information," explained computation of this credit:

> Any corporation doing business in Indiana is required to compute its Indiana income tax under both the Gross Income Tax Act of 1933 as amended and the Adjusted Gross Income Tax Act of 1963 as amended. The corporation will pay the greater of the two taxes, applying payments made under either act against the ultimate amount due.

The 1975 and 1976 Indiana corporate income tax return forms asked taxpayers to separately compute both GIT and AGIT. If AGIT was larger than GIT, the taxpayer subtracted the amount of GIT from the amount of AGIT. The resulting AGIT was added to GIT to compute the tax. In this manner, Indiana avoided imposing a double tax on corporations doing business both within and without the state. The 1977, 1978, and 1979 forms asked taxpayers to separately compute both GIT and AGIT and use the

---

1. 4 C.F.R. §§ 400–420 were removed by 57 Fed. Reg. 14148, 14152 (1992). However, the Cost Accounting Standards (CAS) continue to apply to contracts into which they are referenced.

greater amount to compute the tax. In 1979, the Indiana Revenue Board stated:

> Corporate taxpayers ... are subject to both the gross and adjusted gross income taxes.... However, IC 6–3–3–2 provides for a credit against the corporation's Adjusted Gross Income Tax liability for any Gross Income Tax imposed. Thus, the taxpayer will be subject to the greater of the two taxes plus the supplemental net income tax ... and will apply payments made under either tax against the ultimate amount due.

In 1988, the Indiana Department of Revenue ruled that GM was liable for GIT for 1975–1979 even though the amount of AGIT exceeded GIT:

> [T]he "greater of" concept clearly was not intended to—and could not—relieve GM of its statutory obligation to pay the GIT. Nor could it rescind the quarterly GIT payments that GM made prior to filing the annual return. Rather, the "greater of" concept merely expressed in simpler terms the arithmetical result of applying the statutory credit for the GIT.

In its 1993 ruling, however, the ASBCA decided, on the basis of testimony from an Indiana revenue officer, that when AGIT exceeds GIT, a corporation's "total tax liability will be determined by the calculation of the [AGIT]." Under the ASBCA's analysis, GIT had no effect on GM's total taxes, nor on its tax costs under the contract. Therefore, the ASBCA attributed GM's total tax burden from 1975 to 1979 to AGIT.

*GM's Allocation Methods*

GM paid Indiana state income taxes on behalf of DDAD–I. DDAD–I's obligation to pay state taxes increased the costs of performing the contract with DOD. To the extent that GM paid Indiana state taxes for DDAD–I and did not allocate the cost, it seeks an adjustment to the defense contract price to offset the cost of performing in Indiana. Therefore, the first issue in this case requires analysis of GM's method of allocating part of its Indiana state tax burden to DDAD–I.

GM used several methods to allocate Indiana state income taxes to its defense segment: the "pre–1974 method," the "composite rate method," and the "1975–1979 method." Before 1974, GM allocated SNIT and the greater of either GIT or AGIT to the defense segment. GM could allocate the total GIT paid for DDAD–I directly to DDAD–I because GIT reflected DDAD–I's gross Indiana revenues. GM's AGIT, however, was based on its federal adjusted gross income from sources both within and without Indiana.[2] When AGIT exceeded GIT, therefore, GM allocated only its Indiana AGIT and SNIT to DDAD–I under the pre–1974 method. Thus, GM only allocated indirectly to DDAD–I.

GM later decided to change to the composite rate method. GM properly disclosed its

---

2. To calculate DDAD–I's share of GM's Indiana business activity, GM applied a three-factor formula. Under this formula, the numerator determines the defense segment's share of the assessment base and the denominator determines the total assessment base:

$$\cfrac{\dfrac{\text{DDAD–I Payroll}}{\text{GM Payroll Everywhere}} + \dfrac{\text{DDAD–I Property}}{\text{GM Property Everywhere}} + \dfrac{\text{DDAD–I Sales}}{\text{GM Sales Everywhere}}}{3}$$

$$\cfrac{\dfrac{\text{Indiana Payroll}}{\text{GM Payroll Everywhere}} + \dfrac{\text{Indiana Property}}{\text{GM Property Everywhere}} + \dfrac{\text{Indiana Sales}}{\text{GM Sales Everywhere}}}{3}$$

GM applied the percentage derived from this formula to compute the amount due under AGIT and SNIT.

change to this method. Under the new method, GM proposed to allocate taxes to DDAD–I according to an average of GM's state and local tax payments nationwide. In October 1975, however, the Government's Corporate Administrative Contracting Officer notified GM that it could no longer use the composite rate method.

In November 1975, DDAD–I submitted to the Administrative Contracting Officer a revision to its Disclosure Statement. DDAD–I indicated that it had retroactively reinstituted the pre–1974 method of allocating Indiana taxes:

> [The new method will] supersede the current [composite rate] method.... It should be noted that this reverts the accounting treatment for state and local taxes back to the method being used just prior to the current [composite rate] method. The general magnitude of the change ... is, in our opinion, negligible.

In a December 1975 letter to the Administrative Contracting Officer, GM noted that it had "reinstituted the prior accounting practice of recording Indiana taxes at the same rate as used for [contract] pricing."

GM did not, however, revert to the pre–1974 method. Instead, GM adopted the 1975–1979 method. Under the 1975–1979 method, GM computed a separate GIT and AGIT for its defense segment and for the rest of its Indiana business. Under this method, the GIT was the greater of the two taxes for the segment. Therefore, GM directly allocated these GIT taxes to the defense segment. The parties agree that this method does not comply with CAS 403.

*ASBCA Proceedings*

In May and October 1984, the Administrative Contracting Officer rendered final decisions that GM had violated CAS 403 by overallocating Indiana state taxes to DDAD–I from 1975 through 1979. This decision asserted extensive monetary claims against GM. GM appealed to the ASBCA.

Before the ASBCA, GM advocated a new method—the "claim method"—to bring its accounting practices into line with CAS 403. The claim method directly allocates all GIT taxes to DDAD–I, even when AGIT is larger

than GIT. The claim method then allocates the AGIT overage—the amount of the AGIT remaining after the GIT credit—to DDAD–I according to a percentage calculation as in the pre–1974 method. DOD contended before the ASBCA that the claim method violates CAS 403 by allocating a disproportionate share of GM's Indiana tax burden to the defense segment.

The Board heard the Government's claim for a downward price adjustment based on overallocation of Indiana taxes to the defense segment. The Board also heard GM's claim based on underallocation of taxes to the defense segment. The Board decided in favor of the Government on both claims.

## DISCUSSION

This court reviews only final decisions of the boards of contract appeals. 28 U.S.C. § 1295(a)(10) (1988 & Sup. IV 1992). The finality requirement for Board decisions, however, is not synonymous with the strict finality requirement for district court actions. *Garrett v. General Elec. Co.*, 987 F.2d 747, 751 (Fed.Cir.1993) (quoting *Dewey Elecs. Corp. v. United States*, 803 F.2d 650, 655 (Fed.Cir.1986)).

In this case, the ASBCA issued decisions on entitlement in ASBCA Nos. 30510 and 31226 and remanded them to the parties for a determination of quantum. The ASBCA had consolidated these two appeals with two other appeals on which the CO did not determine quantum. Resolution of the same issues will decide all disputes between the parties. Therefore, this court has jurisdiction over the substantive issues.

## CAS 403

 CAS 403.40(a)(1) required contractors to allocate home office expenses based on beneficial or causal relationships. CAS 403.-40(a)(1); 4 C.F.R. § 403.40(a)(1) (1992).

> Central payments or accruals which are made by a home office on behalf of its segments shall be allocated directly to segments to the extent that all such payments or accruals of a given type or class can be identified specifically with individual segments.... Common examples [of central

payments] include ... State ... income taxes.... Any such types of payments or accruals which cannot be identified specifically with individual segments shall be allocated to benefited segments using an allocation base representative of the factors on which the total payment is based.

CAS 403.40(b)(4), 4 C.F.R. § 403.40(b)(4). Thus, under CAS 403, a contractor must allocate state income taxes directly to segments to the extent they can be identified with the segments.

Both this court and its predecessor, the United States Court of Claims, have interpreted CAS 403. In *Boeing Co. v. United States*, 230 Ct.Cl. 663, 680 F.2d 132 (1982), *cert. denied*, 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 343 (1983), the Court of Claims examined whether Boeing had properly allocated its Washington state and local income taxes between its segments. Boeing used a "headcount" allocation system which allocated costs to the segments in proportion to the number of employees in that segment. *Id.* at 134.

In determining the legality of this allocation method, the Court of Claims interpreted CAS 403 to require "direct allocation of these [home office] expenses 'to the maximum extent practical.'" *Id.* at 135. Under CAS 403.40(b)(4), according to the court, "central payments made by the home office are to be allocated directly to the individual segments if they can be so identified." *Id.* Under this reading of CAS 403, this court's predecessor determined that the headcount method violated CAS 403. *Id.* at 136. A proposed alternative method that directly allocated tax expenses to segments was upheld. *Id.* In defining "to the maximum extent practical" the court stated that "practical" means "no more than economically feasible." *Id.* at 136–37; *see also United States v. Lockheed Corp.*, 817 F.2d 1565, 1570 (Fed.Cir.1987). The court's "maximum extent practical" doctrine also requires allocation of specifically identified costs separate from costs not specifically identified with a particular segment. *Boeing*, 680 F.2d at 137.

■ As these passages note, *Boeing* requires separate and direct allocation of those taxes specifically identified with a particular segment. In this case, GIT is specifically identified with GM's Indiana defense segment through gross receipts in Indiana. GM's other segments have no effect on the gross receipts of DDAD–I. Therefore, under the language of CAS 403, GM must separately and directly allocate GIT taxes to DDAD–I.

■ In sharp contrast to GIT, AGIT is a tax on unitary corporate income. In fact, testimony before the ASBCA indicates that the Indiana AGIT was imposed to insure that companies doing business in Indiana but having no Indiana gross receipts do not escape state taxes. GM owed no AGIT taxes in Indiana unless GM's operations as a whole had net income. Thus, GM, by definition, could not specifically identify its AGIT liability with its Indiana defense segment alone.

In sum, GIT and AGIT are very different taxes with very different purposes, and most important, with very different assessment bases. Because GIT's assessment base— gross revenues in Indiana—specifically and solely associates with DDAD–I, GM had an obligation under CAS 403 to allocate directly this tax to its defense segment. Because AGIT's assessment base—corporate income—does not specifically nor solely associate with any single segment, GM had no obligation to allocate directly this tax to its defense segment.

The claim method alone correctly applies CAS 403 in this case. Only the claim method, to the maximum extent practical, directly allocates those taxes specifically identified with GM's defense segment. This method isolates and directly allocates GIT—the tax specifically identified with GM's defense segment.

ASBCA erred by rejecting the claim method. Specifically the Board erred by concluding that AGIT, when larger, subsumes GIT. In the words of the Board:

> It is true that the GIT, as a gross receipts tax applicable to a segment doing business only in Indiana, can be traced exclusively to the segment. Nonetheless, by the operation of the "greater of the two taxes" rule the GIT was subsumed into the AGIT

when the latter was the greater of the two taxes.

This language acknowledges GIT's irrefutable identification with DDAD–I. By operation of CAS 403, as clarified by *Boeing,* GM must separately and directly allocate this amount.

Nonetheless the ASBCA concluded that GIT somehow disappeared or was subsumed by AGIT. *General Motors,* 93–2 B.C.A. at 128,151. This faulty analysis overlooks several critical factors. First, the language of the Indiana Code clarifies that AGIT does not subsume or swallow GIT. The Code grants corporations a credit "against AGIT" in the amount of GIT. Ind.Code § 6–3–2 (1972). A credit "against AGIT" means subtraction of the credit amount from AGIT. The credit is the amount of GIT, not GIT itself. Under the terms of the Indiana Code, the distinct GIT tax does not disappear into AGIT. Rather, an amount equal to GIT applies against the amount of the separate AGIT liability.

The Board's subsuming analysis also overlooks the distinct character of the two taxes. For instance, the revenues from GIT and AGIT have entirely different destinations. Indiana Attorney General Official Opinion Number 38, dated July 17, 1964, explained the significance of that distinction. The attorney general issued this 1964 opinion in response to a request from the Commissioner of State Revenue. The Department of State Revenue had taken the position that only the AGIT overage—the amount left after subtraction of the GIT amount—goes to the Property Tax Relief Fund, the designated destination for AGIT funds. The Attorney General's official opinion found this policy correct because the overage was the only revenue from AGIT. In other words, GIT retains its identity, even when AGIT is the greater of the two taxes. Even when AGIT exceeds GIT, GIT revenues go to the State General Fund.

The former Administrator of the Indiana Department of Revenue's Income Tax Division reached the same conclusion in testimony before the ASBCA:

[The Indiana Legislature] wanted to separate the two taxes. If they had not

applied the credit and the adjusted gross income tax were greater, then it would be likely that all of the revenue funds would go into this Property Tax Relief Fund, and, thus, there would be no funds left for the general fund, and it would be very difficult to run the state in that manner.

In other words, the "greater of the two taxes" rule is a means to ease calculation of taxes. Nothing more.

CAS requires the separate and direct allocation of home office expenses, including state income taxes, that can be identified with the segment. GIT is the only Indiana state income tax specifically identified with GM's defense segment. AGIT does not in fact or by operation of law subsume GIT. Therefore, GM must directly allocate GIT to its defense segment under CAS 403 and *Boeing.* The claim method alone satisfies these requirements. The other methods rely on the faulty conclusion that AGIT, when the greater of the two taxes, is the only tax paid.

### Violation of Disclosure Obligations

■ The Cost Accounting Standards Board promulgated CAS 403 under its statutory mandate to make regulations that bind defense contractors. 50 U.S.C. app. § 2168(h)(1) (1982). CAS 403 required contractors, as a condition of contracting, to disclose any change in cost accounting methods. The CAS clause in GM's contract recites:

If any change in disclosed practices is made for purposes of any contract or subcontract subject to Cost Accounting Standards Board requirements, the change must be applied prospectively to this contract, and the Disclosure Statement must be amended accordingly.

Armed Services Procurement Regulation (ASPR) 7–104.83 (July 1974). Thus, GM's contract requires amendment of GM's accounting disclosure statement before changing methods. This disclosure requirement achieves uniformity between contractors and consistency over time. Cost Accounting Standards Board: Restatement of Objectives, Policies and Concepts, Cost Accounting

Standards Guide (CCH) ¶ 2915 at 4029–30 (1984).

GM's last disclosed accounting method, with the exception of the revoked composite rate method, was the pre–1974 method. GM changed cost accounting methods when it adopted the 1975–1979 method. GM, however, did not amend its disclosure statement, and, in fact, affirmatively misled the Government about the change. GM's change to the 1975–1979 method resulted in increased costs to the Government. The ASBCA correctly determined that GM did not properly disclose its accounting method change.

■ Although substantial evidence supports the ASBCA finding that GM did not disclose its method change, the proper remedy for this violation is not reinstatement of the pre–1974 method. The pre–1974 method did not comply with CAS 403. The remedy for a violation of CAS disclosure requirements is not to require continued violation of CAS allocation requirements.

Paragraph (5), the CAS clause in GM's contract, supplies the remedy. Under this clause, GM must:

> (5) Agree to an adjustment of the contract price or cost allowance, as appropriate, if he or a subcontractor fails to comply with an applicable Cost Accounting Standards or to follow any practice disclosed . . . and such failure results in any increased costs paid by the United States. Such adjustment shall provide for recovery of the increased costs to the United States together with interest thereon.

ASPR 7–104.83. Because GM did not disclose its accounting method change, GM has already agreed to the remedy—adjustment of the contract price to compensate for any increased costs to the United States plus interest.

The cost to the Government increased when GM used the 1975–1979 method rather than the pre–1974 method without disclosing the change. Therefore, GM is liable for damages under paragraph (5) of the CAS Clause. GM has contractually agreed to the amount of damages—the increased cost to the Government plus interest. This increased cost is the difference between the pre–1974 method and the 1975–1979 method. This cost is the amount that DOD actually paid in contract costs without proper disclosure and notice of GM's accounting practice change.

Although only the claim method complies with CAS 403, DOD incurred no costs under the claim method.[3] The actual increased costs to DOD stemmed from GM's switch to the 1975–1979 method. Thus, this court remands for calculation of the damages (increased costs plus interest) due to GM's violation of the CAS 403 disclosure requirement.

### CONCLUSION

Cost Accounting Standard 403 requires contractors to allocate separately and directly any home office expenses specifically identified with a particular segment. Therefore, GM must allocate specifically identified Indiana state income taxes to its defense segment. This court reverses that portion of the Board's decision holding otherwise. This court affirms the Board's holding that GM violated its disclosure obligation when it changed cost accounting methods. This court remands for a determination of damages under paragraph (5) of the CAS Clause contained in the contract.

### COSTS

Each party to bear its own costs.

*REVERSE and REMAND.*

NIES, Circuit Judge, concurring in part.

I concur on two points in the majority opinion. First, I agree that this Court has jurisdiction to hear the appeal. Second, I agree that the Board properly held that GM failed to disclose its 1975–79 method and that the undisclosed 1975–79 method caused increased costs to the government compared with the disclosed pre–1974 method. GM

---

**3.** Paragraphs (3) and (4) of the Cost Accounting Standards (CAS) clause in GM's contract require compliance with all CAS standards. These paragraphs also provide procedures for changes in the CAS. In this case, no general cost accounting standards, only GM's particular cost accounting methods, changed. Paragraph (5) specifies the remedy for GM's violation of the CAS clause.

**1384**

must now rebate the difference between amounts received from the government and amounts that would have been paid using the pre–1974 method.

The Board held that the pre–1974 method is the correct method to measure the amount of Indiana taxes that GM paid and that GM's failure to disclose the 1975–79 method caused increased cost to the government. Since we affirm the Board's conclusion concerning increased costs due to the failure to disclose, we do not need to reach the issue of whether GM's proposed claim method is correct or whether the disclosed pre–1974 method is correct. The regulations afford a contractor an opportunity to change its disclosed accounting method, but GM failed to follow that path.

Although the majority purports to reverse and remand, the result is that we are affirming on one of the grounds relied upon by the Board. Moreover, the damage calculation in the majority's "reversal" is the same as the Board's damage calculation. The Board also fixed the damages at the difference between the amounts received under the undisclosed 1975–79 method and the disclosed pre–1974 method.

GM argues that it is entitled to an upward cost adjustment because the regulations are mandatory on both the government and the contractor. GM believes that since it under-allocated its true tax cost, the regulations mandate an equitable adjustment in its favor. However, the fallacy in GM's reasoning is that GM need not include any taxes in its costs if GM so chooses. The regulations are mandatory in the sense of setting the maximum amount. Here, GM included a smaller amount for taxes than, *arguendo*, it was entitled to charge. In that situation, the regulations require GM to "follow consistently the cost accounting practices disclosed" and to "agree to an adjustment of the contract price ... if [GM] fails ... *to follow any practice disclosed ... and such failure results in any increased costs paid by the United States.*" Armed Services Procurement Regulations 7–104.83(a)(3) & (a)(5) (Jan. 1974) (emphasis added). GM failed to follow the accounting practices disclosed and, therefore, must remit any excess payments over the amount calculated under the disclosed accounting practice.