**SEAL 1; Seal 2, Plaintiffs–Appellants,**

v.

**SEAL A, Defendant–Appellee.**

No. 98–56447.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 2000.

Filed July 5, 2001.

Brian C. Leighton, Clovis, California and James A. Moody, Washington, D.C., for the plaintiffs-appellants.

Michael A. Sherman and Grant E. Kinsel, Alschuler Grossman Stein & Kahan LLP, Los Angeles, California, for the defendant-appellee.

Stephanie R. Marcus, Dept. of Justice, Washington, D.C., for United States, Amicus Curiae.

Before: PREGERSON, W. FLETCHER, and RONALD M. GOULD, Circuit Judges.

WILLIAM A. FLETCHER, Circuit Judge:

Appellant Abraham Gale ("Gale") worked for ten weeks for Packard–Bell NEC, Inc. ("PBNEC"). After being fired by PBNEC, Gale filed a qui tam action against that company under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, alleging that it had committed fraud by selling computers to the government as new even though they contained used parts. The government declined to intervene in Gale's FCA suit, but nonetheless initiated criminal and civil investigations into PBNEC's allegedly fraudulent practices. The United States Attorney allowed Gale to review documents obtained during at least one of those investigations, as well as during its investigation into one of PBNEC's then-competitors, Appellee Zenith Data Systems, Inc. ("Zenith"). After learning from the government documents he saw in the office of the United States Attorney, as well as from oral disclosures by government attorneys in that office, that Zenith was probably involved in the same type of fraud as PBNEC, Gale filed a separate FCA action against Zenith. The government, PBNEC, and Zenith subsequently reached a proposed settlement to which Gale objected. After an evidentiary

hearing, the district court held that it did not have jurisdiction over Gale's FCA action against Zenith and dismissed the complaint. Gale appeals that dismissal.

We agree with the district court that it lacked jurisdiction over Gale's Zenith action, and we affirm.

I

Gale was employed for ten weeks by PBNEC as Manager of the Computer Department. He was fired during his probationary period, in December 1994. Three months later, Gale wrote a letter to the government alleging that PBNEC had committed fraud against the government. PBNEC sold to the government computers that it claimed were new and for which it charged new-computer prices. Gale alleged that in fact those computers contained used parts. Gale mentioned only PBNEC in his letter. He made no mention of Zenith, a company that had an "alliance agreement" or "joint manufacturing agreement" with PBNEC during 1994 and 1995.[1]

Gale filed a qui tam complaint under the FCA against PBNEC in April 1995. Although the government investigated PBNEC and proposed a settlement, it never intervened in Gale's action. At about the time Gale filed his FCA complaint against PBNEC, Compaq Computer Corporation ("Compaq") sued PBNEC, claiming unfair competition due to PBNEC's alleged practice of selling computers with used parts as new. During discovery in its suit, Compaq questioned PBNEC witnesses about the relationship between PBNEC and Zenith. In August and September 1995, the United States Attorney's Office ("USAO") discussed the government's PBNEC investigation with lawyers for Compaq, and in September the USAO

initiated an investigation of Zenith. The Air Force Office of Special Investigation ("OSI") also launched an investigation of Zenith at the request of the USAO. In the course of these investigations, the USAO obtained a substantial amount of information about Zenith's sales practices.

Although Gale was not an active participant in the PBNEC investigations, the USAO allowed him to examine documents that it had obtained. From January through May 1996, Gale reviewed PBNEC documents that government lawyers had obtained through a Department of Defense subpoena issued to PBNEC. Those documents contained information raising the possibility that Zenith had committed fraud on the government similar to that committed by PBNEC. Government lawyers state that they also orally informed Gale that there was a possibility that some Zenith computers sold to the government had contained used PBNEC parts.

In April 1996, Gale filed a separate qui tam action under the False Claims Act, this time against Zenith. In October 1996, the government, PBNEC, and Zenith proposed a settlement, to which Gale objected, that would have disposed of both cases. Zenith asserts that Gale demanded an $8 million payment in return for his agreement to the settlement, and that the other parties refused this offer.

In March 1998, the district court held that it had jurisdiction over Gale's FCA case against PBNEC, and it held an evidentiary hearing to determine whether it had jurisdiction over his case against Zenith. Gale maintained in the district court that he had first seen the documents he had reviewed in the United States Attorney's Office during his employment at PBNEC, and that the government had

---

1. Zenith became a wholly-owned subsidiary of PBNEC in April 1996, and a division of PBNEC in 1997.

needed his help to make sense of the information they contained. The district court found that Gale was not credible. Among other things, it found that "Mr. Gale did not know about the alleged Zenith fraud until he started to review documents at the United States Attorney's Office...." "Overall, it is clear to this court that even if some form of Zenith fraud did occur, Mr. Gale was not aware of it from his experiences at Packard Bell." "Mr. Gale did not learn about the alleged Zenith fraud from any independent investigation he conducted after his employment at Packard Bell but prior to his review of documents at the U.S. Attorney's Office."

The district court held that "the government's disclosure to Mr. Gale of documents and information in the Packard Bell case which contained 'allegations or transactions' about the Zenith fraud was a 'public disclosure' pursuant to 31 U.S.C. § 3730(e)(4)(A)." It further held that Gale was not an "original source" of the information within the meaning of 31 U.S.C. § 3730(e)(4)(A), and under our holding in *United States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407 (9th Cir.1993). It then dismissed Gale's FCA suit against Zenith, holding that it lacked jurisdiction over the case.

The government settled Gale's FCA suit against PBNEC for $3.5 million, and Gale recovered a relator's share of fifteen percent of that settlement. Gale appeals the dismissal of his FCA suit against Zenith.

## II

The False Claims Act is a tool to fight fraud on the government. Under the FCA, the government or a private party may bring a civil action against a party allegedly committing such fraud. 31 U.S.C. §§ 3730(a), (b). The qui tam provisions of the statute-those pertaining to private parties-provide incentives for insiders with knowledge of fraud on the government to come forward with that knowledge. 31 U.S.C. § 3730(d). If a private party brings a qui tam action, she does so as a "relator," on behalf of the government, which may choose to intervene in the action. If the relator is successful, she is entitled to a share of the recovery, whether or not the government intervenes. 31 U.S.C. §§ 3730(d)(1), (2).

The compensation available to relators, however, encourages parasitic lawsuits in which those with no independent knowledge of fraud use information already available to the government to reap rewards for themselves without exposing any previously unknown fraud. The FCA reflects Congress' attempt to find " 'the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own.' " *United States ex rel. Devlin v. California*, 84 F.3d 358, 362 (9th Cir.1996) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C.Cir.1994)).

In earlier versions of the FCA, the statute was abused by qui tam suits brought by private plaintiffs who had no independent knowledge of fraud. *See, e.g., United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943). In *Marcus*, the Supreme Court held that a private plaintiff might bring a qui tam action under the FCA, as it then existed, even though his knowledge of fraud was gained from a government criminal indictment. *Id.* at 546, 63 S.Ct. 379. In reaction to *Marcus*, Congress amended the FCA in 1943 to bar jurisdiction over qui tam suits that were "based on evidence or information the government had when the action was brought." 31 U.S.C. § 3730(b)(4) (1982) (superseded). This amendment led to unintended conse-

quences, however, as it deprived courts of jurisdiction over suits in which the would-be relators had given their information to the government before filing their claims. *See, e.g., United States ex rel. Wisconsin v. Dean,* 729 F.2d 1100, 1106 (7th Cir. 1984).

■ Congress amended the FCA in 1986 to its current form in an attempt to achieve the proper balance. The relevant text provides:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original · source" means an individual who has direct and independent knowledge of the ·information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. §§ 3730(e)(4)(A), (B). The analysis under this provision is divided into two steps. First, the court must determine whether, at the time the complaint was filed, there has been a "public disclosure" of the "allegations or transactions" on which the claim is based. 31 U.S.C. § 3730(e)(4)(A). If the allegations or transactions were not publicly disclosed, the court has subject matter jurisdiction even if the relator was not the original source of the information. *United States ex rel. Wang v. FMC Corp.,* 975 F.2d 1412, 1419–20 (9th Cir.1992). Second, if the allegations or transactions were publicly dis-

closed, the relator may bring the suit only if she was "an original source of the information." 31 U.S.C. § 3730(e)(4)(A); *Barajas,* 5 F.3d at 411.

## III

### A. Public Disclosure

There are two aspects to public disclosure under § 3730(e)(4)(A). First, the disclosure must have been through a method specified in the statute. Second, the disclosure must have been "public" within the meaning of the statute.

#### 1. "Investigation"

Section 3730(e)(4)(A) sets forth a list of methods for making a "public disclosure" of allegations or transactions. The disclosures may be "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or *investigation,* or from the news media. . . ." 31 U.S.C. § 3730(e)(4)(A) (emphasis added). This court has not yet decided whether that list is exhaustive, but most other circuits to consider the question have concluded that it is. *See Eberhardt v. Integrated Design & Const., Inc.,* 167 F.3d 861, 870 (4th Cir.1999); *United States ex rel. Dunleavy v. County of Delaware,* 123 F.3d 734, 744 (3d Cir.1997); *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 323 (2d Cir.1992); *United States ex rel. Williams v. NEC Corp.,* 931 F.2d 1493, 1499–1500 (11th Cir.1991); *United States ex rel. LeBlanc v. Raytheon Co., Inc.,* 913 F.2d 17, 20 (1st Cir.1990). The Tenth Circuit, however, has found that the list is not exhaustive:

[T]his court rejected the argument that the disclosure itself must be through one of the listed sources in section 3730(e)(4)(A). Instead, in order for the jurisdictional bar to apply, the allegations of fraud or fraudulent transactions

must be contained in one of the forms, or be available from one of the *sources,* listed in [that] section. . . . That section defines the sources of allegations and transactions which trigger the bar but it does not define the only *means* by which public disclosure can occur.

*United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1004 (10th Cir.1996) (emphasis in original) (internal citations omitted). In light of our reading of § 3730(e)(4)(A), we do not need to decide whether the list is exhaustive.

We must decide in this case whether the investigations undertaken by the government, and disclosed to Gale, are "investigation[s]" within the meaning of § 3730(e)(4)(A). It is common to refer to investigations under this section as "administrative investigations." *See, e.g., United States ex rel. Aflatooni v. Kitsap Physicians Services,* 163 F.3d 516, 524 (9th Cir.1999); *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1419 (9th Cir.1991). It is clear that administrative investigations are included within the term. But we see no reason, based on either the text or on any policy behind it, to limit the term to a particular kind of government investigation.

■ We read the term "investigation" in the context of Congress' purposes in amending the FCA in 1986. One of the policy goals behind the amendments was to "reject[ ] suits [that] the government is capable of pursuing itself, while promoting those [that] the government is not equipped to bring on its own." *Springfield Terminal Ry. Co.,* 14 F.3d at 651. We have stated that "[t]he 1986 amendments also reflected Congress's recognition that the government simply lacks the resources to prosecute all viable claims, even when it knows of fraudulent conduct." *United States ex rel. Schumer v. Hughes Aircraft Co.,* 63 F.3d 1512, 1519 (9th Cir.

1995), *vacated on other grounds,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). In construing § 3730(e)(4)(A), we have emphasized the statute's purpose of assisting the government:

Under § 3730(e)(4)(A), if the allegations were not previously disclosed to the public, the relator's complaint benefits the government, and the relator is rewarded without inquiring into the details of how the relator obtained the information. If, on the other hand, the allegations in the complaint do not benefit the government because the government already knew about them, then § 3730(e)(4)(A) bars jurisdiction unless the second policy is furthered, that is, an insider provided information to the government who was under no duty to do so.

*United States ex rel. Biddle v. Board of Trs. of Stanford Univ.,* 161 F.3d 533, 539 (9th Cir.1998); *see also Aflatooni,* 163 F.3d at 521–22 & n. 8.

■ The relevant portion of the text provides that the disclosure may be "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation. . . ." 31 U.S.C. § 3730(e)(4)(A). It is a truism that statutory interpretation begins with the plain meaning of the statute's language. *United States v. Alvarez–Sanchez,* 511 U.S. 350, 356, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994). " 'If a legislative purpose is expressed in plain and unambiguous language, . . . the . . . duty of the courts is to give it effect according to its terms. Exceptions to clearly delineated statutes will be implied only where essential to prevent absurd results or consequences obviously at variance with the policy of the enactment as a whole.' " *United States ex rel. Lujan v. Hughes Aircraft Co.,* 243 F.3d 1181, 1187 (9th Cir.2001) (alteration in original) (quoting *United States v. Ruther-*

*ford,* 442 U.S. 544, 551–52, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979)).

■ We find the language of this provision somewhat ambiguous. We further find that one plausible reading of the phrase at issue-that "congressional," "administrative," and "Government Accounting Office" all modify (and therefore limit) all four of the nouns that follow, including "investigation"-produces, in Gale's case, an absurd result. Congress' intent in amending the FCA in 1986 is· quite clear, and allowing Gale to bring an FCA claim based on information given directly to him by the government during the government's own investigation is obviously not what Congress intended. The purpose of this provision of the FCA is to prevent someone like Gale, who has information only because he obtained it from the government, from profiting from that information and thereby diminishing the government's recovery from the defrauder. Whether a government investigation is criminal, civil, administrative, or some other kind should not make any difference.

We conclude, therefore, that the term "investigation," as used in § 3730(e)(4)(A), must encompass any kind of government investigation-civil, criminal, administrative, or any other kind. The district court's findings of fact make clear that the information upon which Gale's FCA complaint is based was obtained by him from investigations conducted by the government. The question then becomes whether the information from the investigations was publicly disclosed within the meaning of § 3730(e)(4)(A) when Gale was shown documents from the investigations and told about the information learned in them.

## 2. "Public"

■ We must decide whether Gale, in the circumstances of this case, is a member of the "public" within the meaning of "public disclosure" under § 3730(e)(4)(A).

We have previously indicated that a government employee to whom information relevant to an FCA action is disclosed is not a member of the public under this section. *See Hagood,* 929 F.2d at 1419; *see also Schumer,* 63 F.3d at 1518, *vacated on other grounds,* 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). We have also rejected, in *Schumer,* 63 F.3d at 1519, a Second Circuit decision holding that employees of a corporation later sued under the FCA were members of the public for purposes of that suit. *See Doe,* 960 F.2d at 323. The Second Circuit held in *Doe* that federal investigators who had informed employees of the defendant corporation, at their place of work, that the government was investigating allegations against the corporation had made a "public disclosure" of those allegations. *Id.* at 322–23. In *Schumer,* we rejected the Second Circuit's rule. In our view, such an action is not public disclosure. "Because the employee has a strong economic incentive to protect the information from outsiders, revelation of information to an employee does not trigger the potential for corrective action presented by other forms of disclosure." *Schumer,* 63 F.3d at 1518. Further, the rule adopted by the Second Circuit in *Doe* "would run contrary to [the] purpose [of the FCA], for it drastically curtails the ability of insiders to bring suit once the government becomes involved in the matter." *Id.* at 1519.

In contrast to the private individuals in *Hagood* and *Doe,* Gale was an outsider to the Zenith investigation at the time he received the information in the United States Attorney's Office. Moreover, he had significant incentive (and no disincentive) to use allegations of fraud by Zenith to his own advantage. Holding that Gale is a member of the public for purposes of the Zenith investigation and any subsequent FCA suit against Zenith is consistent with Congress' intent that the FCA

not be used by people attempting to "free ride" on information obtained from the government. Gale signed a "Declaration" requiring him to keep confidential the information he obtained from the USAO, but this does not undermine our conclusion that Gale is a member of the public for purposes of his suit against Zenith. Disclosure of information to one member of the public, when that person seeks to take advantage of that information by filing an FCA action, is public disclosure. It may not be public disclosure as to some other member of the public who independently comes upon information already possessed by the government and disclosed to a person like Gale, and who then files an FCA action based on the information independently obtained. But it is public, as to Gale, in the sense necessary to the sensible operation of § 3730(e)(4)(A). Because it was disclosed to an outsider to the investigation who now seeks to profit from it as an FCA relator, it was publicly disclosed to that person.

## B. Original Source

Because the information underlying Gale's suit was publicly disclosed to Gale under § 3730(e)(4)(A) before he filed his Zenith complaint, we must determine whether he was an "original source" of that information. If so, there is no jurisdictional bar to Gale's action despite the public disclosure. Section 3730(e)(4)(B) defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

We construed this provision of the FCA in *Barajas,* holding that a person is an "original source" of publicly disclosed information if the person's original disclosure "triggered" the investigation that led to the publicly disclosed information. *Barajas,* 5 F.3d at 411. Although the relator in *Barajas* had not known of the later allegations before the government discovered them, we held that he could nonetheless be deemed an original source of them. We set forth the following test:

> Barajas is "an original source" with respect to the proposed amendments if he (1) has some direct and independent knowledge of information on which the proposed amendments are based, and (2) voluntarily disclosed that information to the government before filing the original complaint.... Barajas is "an original source" with respect to a proposed amendment if he played some part, whether direct or indirect, in the public disclosure of the allegations that are the subject of the proposed amendments. The answer to this inquiry depends on the facts and circumstances of the individual case, evaluated in light of the central purpose of the Act to encourage persons with knowledge of fraud against the government to come forward with their knowledge.

*Barajas,* 5 F.3d at 411 (internal citations omitted). In *Barajas,* we did not specify how far the test should be extended; that is, we did not specify the proximity that is required between the relator's original disclosure to the government and the publicly disclosed information for which she now claims credit as an original source. If we extended the test to allow a relator to bring a claim based on any information obtained in an investigation, no matter how distantly linked to the relator's original claim, we would extend the "original source" exception to the public disclosure rule beyond what Congress intended.

■ The question before us, therefore, is how close the connection must be between the relator's original disclosure to the government and the allegations that

 

later form the basis for her FCA action. In order to answer that question, we provide the following elaboration of the *Barajas* test. In determining whether a relator is the original source of information discovered in an investigation triggered by her initial disclosures, the district court should consider (1) the degree to which the relator's information helped uncover the later allegations; (2) the degree to which other private actors helped uncover those allegations; (3) the degree to which the government played a role in uncovering those allegations; and (4) whether the later allegations are brought against the same entity as the earlier allegations. If the FCA relator brings suit against a new entity, the relator will not ordinarily be considered an original source of the later allegations against that new entity.

■ It is undisputed that Gale was the original source of information about alleged fraud at PBNEC, and that Gale's information prompted the government to initiate an investigation into that company. Gale's information about PBNEC did not include Zenith, and the district court found not credible his statements that he had learned about alleged fraud at Zenith while employed by PBNEC. The government initiated an investigation into Zenith after discussing its PBNEC investigation with Compaq, a competitor that had independently filed suit against PBNEC, and after learning from Compaq of Zenith's potential fraud. Gale's disclosures thus started the government on the trail that eventually led to Zenith's alleged fraud, but others provided substantial assistance to the government along the way. The government also played a significant role in uncovering the allegations regarding Zenith. At least two government agencies performed investigations of Zenith. Gale played no active role in any government investigation, and Gale obtained his information about Zenith from the government. Finally, when the later allegations were brought against Zenith, it was a separate company from PBNEC, the company named by Gale in his original disclosure.

We hold that, in these circumstances, Gale played an insufficient role in uncovering the later allegations to be deemed an original source.

## CONCLUSION

We hold that there was "public disclosure" to Gale of the "allegations or transactions" involving Zenith within the meaning of § 3730(e)(4)(A), and that Gale was not an "original source" of that information within the meaning of § 3730(e)(4)(B). The decision of the district court is therefore AFFIRMED.