UNITED STATES of America, ex rel. Leslie L. LONGSTAFFE, Plaintiff,

v.

LITTON INDUSTRIES, INC., A Corporation, and Does 1 through 10, Inclusive, Defendants.

No. SACV 03–0579–JVS.

United States District Court, C.D. California, Southern Division.

Dec. 15, 2003.

Thomas V. Girardi, Girardi & Keese, Los Angeles, CA, Greg K. Hafif, Herbert Hafif Law Offices, Claremont, CA, for Plaintiff.

Stephen D. Alexander, Marjorie D. Purcell, Fried, Frank, Harris, Shriver & Jacobson, Los Angeles, CA, Richard A. Suber, Michael L. Walman, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, for Defendant.

## ORDER RE DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

SELNA, District Judge.

This matter is currently before the Court on two Motions to Dismiss the First Amended Complaint ("FAC"), filed by Defendants Litton Industries, Inc. and its successor, Northrop Grumman Corporation (collectively "Litton") on August 13, 2002. The first Motion is brought on the ground that this Court lacks subject matter jurisdiction because the allegations in the FAC are based on publicly disclosed allegations against Litton for which Relator Leslie Longstaffe ("Longstaffe") was not an original source. Fed.R.Civ.P. 12(b)(1); 31 U.S.C.A. § 3730(e)(4) (West 2003). Defendants request either an Order dismissing the FAC or a limited stay of the proceedings pending jurisdictional discovery. (Not. of Mot. to Dismiss FAC for Lack of Jurisdiction, p. 2.) The second Motion is made on the ground that Longstaffe has failed to plead fraud with particularity. Fed.R.Civ.P. 9(b), 12(b)(6).

The Motion to Dismiss for want of jurisdiction is granted, and the Motion to Dismiss for failure to plead fraud with particularity is thus rendered moot.

### I. Background.

This is an action to recover damages, civil penalties, and other relief arising from false statements and false claims allegedly made by Litton in violation of the False Claims Act (FCA), 31 U.S.C.A. §§ 3729–33 (West 2003) and California's Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200–09 (West 1997 & Supp.2003). At all times relevant to the case, and until its merger with Northrop Grumman Corporation in 2001, Litton was a worldwide provider of goods and services ranging from military and commercial electronic systems to navigation equipment. (Bonn Decl., ¶¶ 2–3.) Among other activities, Litton allegedly sold its products to foreign governments through Foreign Military Sales and Foreign Military Financed programs that were subsidized by the United States government. (FAC, ¶ 21.)

Longstaffe, a former Senior Contract Administrator for Litton,[1] alleges that he has "direct and independent knowledge" that Litton: (1) had a practice of hiring "influence peddlers" in order to secure foreign contracts, in violation of Federal Acquisition Regulations and Defense Federal Acquisition Regulations as well as the FCA (FAC, ¶¶ 17–39); and (2) utilized fraudulent accounting practices to hide the fees paid to these "influence peddlers," thereby illegally passing the cost onto the United States Government (*id.* at ¶¶ 40–64).[2]

Litton disputes Longstaffe's contention that he possesses independent knowledge of Litton's allegedly improper dealings with foreign consultants, and points to the fact that Longstaffe's original Complaint was filed on December 18, 1998—more than six years after the United States Government (the "Government") launched a criminal investigation into the same allegedly improper dealings. To this end, Litton has proffered numerous subpoenas for documents and testimony relating to Litton's hiring of foreign sales agents, which subpoenas date back to April 13, 1992. (Waldman Decl., Exhs. 1–79.)

The Government investigation, which initially focused on Litton's dealings with a foreign consultant in Taipei but later broadened to include all or most of Litton's foreign consultants, reportedly involved: (1) Litton producing to the Government tens of thousands of documents from numerous company divisions as well as corporate headquarters (Waldman Decl., ¶¶ 5, 9, 10, 13, 15); (2) Government investigators interviewing hundreds of present and former foreign consultants and present and former Litton employees from various Litton divisions (*id.* at ¶¶ 6, 8, 16, 17); and (3) Dozens of individuals testifying before the grand jury, including present and former Litton employees, customers, subcontractors, and consultants (*id.* at ¶ 18).

The investigation and related allegations against Litton garnered substantial domestic and international news coverage. On November 5, 1993, the Wall Street Journal wrote,

> Litton Industries, Inc. faces possible prosecution according to law enforcement and industry officials for allowing four of its divisions to surreptitiously funnel millions more in allegedly illegal fees to the consultant [Richard Hei in Taipei].

Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Wall Street Journal, Nov. 5, 1993 (Waldman Decl., Exh. 80, pp. 1–2). The Los Angeles Times noted, in March 1996, that federal agents had "seized thousands of records from the headquarters of defense contractor Litton Industries ... as part of a criminal investigation into allegations of fraudulent billing on government contracts" that was "based

---

1. Longstaffe was employed as a Senior Contract Administrator for Litton Guidance and Control Systems, a division of Litton Industries, Inc., for seventeen years. (FAC, ¶ 6.)

2. According to Longstaffe, corporate liability should attach to Litton because the corporation: (1) "used its status as a world-wide supplier to conceal from the United States its true production costs and profits on contracts funded wholly or in part with United States funds" (FAC, ¶ 13); (2) "amassed a team of accountants, attorneys, and procurement personnel who used Litton's divisions and subsidiaries ... to fraudulently inflate costs in proposals on military projects that included pads for ... illegal bribes and commissions" (*id.* at ¶ 14); (3) paid foreign consultants "regular retainers of thousands of dollars per month" to "obtain contracts with foreign governments to sell services and supplies" (*id.* at ¶ 15); and (4) "implemented its policy of obtaining foreign contracts with influence peddlers through corporate policies and forms created by its accountants and attorneys at the corporate executive level" (*id.* at ¶ 16).

on evidence that the firm had inflated prices on certain contracts." Aaron Curtiss & Ralph Vartabedian, *Federal Agents Raid Offices of Litton Industries,* The Los Angeles Times, Mar. 28, 1996 (Waldman Decl., Exh. 90, p. 1). Similar articles regarding the investigation of Litton's foreign sales practices were also reported by the Associated Press, Reuters, and other news outlets. (*See* Waldman Decl., Exhs. 80–98.)

In June 1999, the grand jury investigation of Litton ended, when two divisions of Litton pled guilty to allegations of misconduct in connection with three sales to Taiwan in the 1980's and one contract obtained in Greece in 1992. (Waldman Decl., ¶ 19 and Exh. 99.) Following the conclusion of the Government investigation, all of Litton's grand jury documents were transferred to the Civil Division of the United States Attorney's office. (Waldman Decl., ¶ 25.) These documents were subsequently made available to Longstaffe and were analyzed and relied upon by Longstaffe in drafting the FAC, which was filed on February 25, 2002. (Ramsey Decl., ¶¶ 13, 29, 40; Ramsey Dep., pp. 32:19–33:1, 258:5–259:12.) In fact, Litton observes that the documentary proof provided to Litton in 2002 in support of Longstaffe's allegations contained the Bates stamps that Litton had affixed to documents during its production of documents to the federal grand jury. (Waldman Decl., ¶¶ 26–27.)

On February 26, 2003, the United States elected to decline intervention in Longstaffe's suit, pursuant to 31 U.S.C.A. § 3730(b)(4)(B). Litton now moves the Court for an Order dismissing the FAC, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## II. *Discussion.*

### A. *12(b)(1) Motion*

■ On Litton's Motion to Dismiss for lack of jurisdiction, Longstaffe bears the burden of establishing that the exercise of this Court's jurisdiction is proper. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182–83, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Longstaffe, as the *qui tam* plaintiff, must establish subject matter jurisdiction "by a preponderance of the evidence," *United States v. Alcan Elec. & Eng'g, Inc.,* 197 F.3d 1014, 1018 (9th Cir.1999), using "competent proof," *McNutt,* 298 U.S. at 189, 56 S.Ct. 780. In making its jurisdictional determination, the Court may rely upon "affidavits or any other evidence properly before the court." *Ass'n of Am. Med. Colleges v. United States,* 217 F.3d 770, 778 (9th Cir.2000).

The FCA permits civil *qui tam* actions such as this one to be filed by a Relator on behalf of the United States against any person who defrauds the Government. 31 U.S.C.A. §§ 3729, 3730(b). The jurisdiction of courts over such *qui tam* actions is limited, however:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C.A. § 3730(e)(4)(A). An "original source" is defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C.A. § 3730(e)(4)(B). These restrictions on a court's subject matter jurisdiction over FCA suits are "intended to bar parasitic lawsuits based upon publicly disclosed in-

formation in which would-be relators seek remuneration although they contributed nothing to the exposure of the fraud." *United States ex rel. Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1157 (2d Cir.1993) (internal citations omitted).

Litton contends that Longstaffe "has brought the paradigmatic 'parasitic' False Claims Act lawsuit," in that the allegations contained in the FAC had been publicly disclosed both by the Government investigation and by the press prior to the filing of Longstaffe's original Complaint. (Mot. to Dismiss for Lack of Jurisdiction, p. 13.) Longstaffe counters that the numerous allegations contained in the FAC "are found nowhere in any of the material submitted by Litton in support of its motion." (Opp'n to Mot. to Dismiss for Lack of Jurisdiction, p. 16.) The disagreement appears to lie in how each party defines "allegations and transactions" for purposes of the analysis. According to Litton, the "Complaint alleges that Litton and its foreign consultants engaged in all sorts of improprieties in connection with its foreign sales." (Mot. to Dismiss for Lack of Jurisdiction, p. 13.) Not surprisingly, Litton concludes that these allegations are "not new information." (*Id.*) In contrast, according to Longstaffe, the FAC alleges that: (1) "Litton hired influence peddlers (salesmen used to influence action 'on any basis other than the merits of the matter' . . .)"; (2) These "sales agents denominated as professionals or consultants . . . violate four distinct and separate provisions applicable to sales consultants charged to overhead"; (3) "[M]any of these agents are hired precisely because they are nationals with connections, which violates . . . anti-discrimination provisions"; (4) "Litton creates bogus monthly retainer agreements that are in reality contingency fee or commission agreements . . . to avoid making the required disclosures and obtaining the required approvals"; (5) "Litton intentionally charges com-

missions to improper accounts . . . in order to hide the fact that it charges for the same type of sales work both directly and indirectly"; (6) "Litton intentionally creates artificial market pricing and artificial catalogs to avoid scrutiny of their prices"; and (7) "Litton improperly obtains double profits by including sister-division kickbacks in its claims material costs . . . ." (Opp'n to Mot. to Dismiss for Lack of Jurisdiction, pp. 12–13.)

■ This Court must reconcile these competing descriptions of Longstaffe's allegations and determine whether the FCA's "public disclosure" bar precludes an exercise of jurisdiction over Longstaffe's lawsuit. 31 U.S.C.A. § 3730(e)(4)(A). As the Ninth Circuit has explained, the analysis under Section 3730(e)(4) is two-pronged. *See Seal 1 v. Seal A*, 255 F.3d 1154, 1159 (9th Cir.2001). First, the Court must determine whether, at the time the complaint in question was filed, there had been a "public disclosure" of the "allegations or transactions" upon which the action is based. 31 U.S.C.A. § 3730(e)(4)(A). If this first question is answered in the negative, the Court has subject matter jurisdiction and the analysis does not proceed to the second step. *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1419–20 (9th Cir.1992). On the other hand, if it is answered in the affirmative, the Court must determine whether the relator was "an original source of the information." *Id.* Only if the relator was an "original source" may a court exercise jurisdiction over a case brought under the FCA that is based upon publicly disclosed information. *United States ex rel. Barajas v. Northrop Corp.*, 5 F.3d 407, 411 (9th Cir.1993).

### 1. *Public Disclosure*

■ The first step of the test is met if: (1) there has been a "public disclosure"; (2) of "allegations or transactions"; (3) "in

a criminal, civil, or administrative hearing, in a congressional, administrative, or [General] Accounting Office report, hearing, audit, or investigation, or from the news media"; and (4) the relator's action is "based on that public disclosure." *United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1409 (9th Cir. 1995). The Court finds that the media coverage of Litton referenced in Litton's moving papers satisfies all four of these elements, and that the "allegations or transactions" that give rise to Longstaffe's action were therefore publicly disclosed at the time he filed suit.[3]

In so finding, the Court adopts a broader description of the "allegations and transactions" contained in the FAC than the description advocated by Longstaffe, and concludes that,

> [Section] 3730(e)(4)(A)'s jurisdictional bar is triggered whenever a plaintiff files a qui tam complaint containing allegations or describing transactions "substantially similar" to those already in the public domain so that the publicly available information is already sufficient to place the government on notice of the alleged fraud.

*United States ex rel. Swan v. Covenant Care, Inc.*, 279 F.Supp.2d 1212, 1217 (E.D.Cal.2002); *accord United States ex rel. Found. Aiding the Elderly v. Horizon West, Inc.*, 265 F.3d 1011, 1015 (9th Cir. 2001). Such a conclusion is consistent with Ninth Circuit precedent. *See United States ex rel. Harshman v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1019 (9th Cir. 1999) (holding that "public disclosure" occurs when a disclosure "contain[s] enough information to enable the government to pursue an investigation"). Moreover, it is consonant with the policies underlying the FCA: "to alert the government as early as possible to fraud that is being committed against it and to encourage insiders to come forward with such information where they would otherwise have little incentive to do so." *United States ex rel. Biddle v. Board of Trustees of Leland*, 161 F.3d 533 (9th Cir.1998), *citing* H.R.Rep. No. 99–660, at 22 (1986); S.Rep. No. 99–345, at 6, 14 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5271, 5279.

Here, the news articles proffered by Litton indicate that the "allegations or transactions" upon which the FAC is based are "substantially similar" to allegations that had already been publicly disclosed through the news media at the time Longstaffe filed the instant action. These articles, published years before Longstaffe initiated his suit, made public allegations of bribery and other misconduct regarding Litton's foreign sales agents. (*See* Waldman Decl., Exhs. 80–98.) They describe

---

**3.** The Court makes no finding regarding whether the Government investigation itself qualifies as a "public disclosure" of "allegations or transactions" for purposes of the public disclosure bar, because it is unclear from the record before the Court exactly what "allegations or transactions" were made public in the course of the investigation. However, the Court agrees with Litton that the investigation's disclosure of information to third parties constitutes a "public" disclosure. It is well settled that "[d]isclosures made in the context of litigation may be publicly disclosed for purposes of § 3730(e)(4)(A)," *United States ex rel. Harshman v. Alcan Elec. & Eng'g, Inc.*, 197 F.3d 1014, 1020 (9th Cir. 1999), so long as they are disclosed to a member or members of the public. Here, the Government investigation cannot be cast aside as simply a series of disclosures to employees or former employees of the "target." (*See* Waldman Decl., Exhs. 7, 8, 13, 18–21, 24–28, 34, 40–44, 46–48, 50, 55–60, 62, 64–67, 69, 72–78; Walker Decl., ¶ 2; Heather Decl., ¶¶ 3, 4, 6; Handzlik Decl., ¶ 4.) The Court also notes that, in view of the scope of the investigation, it almost certainly disclosed "allegations or transactions" to the public within the meaning of the FCA. *But see Wang*, 975 F.2d at 1418 ("[T]he Act bars suits based on publicly disclosed 'allegations or transactions,' not information.").

the "illicit overseas payments," [4] "illegal fees," [5] "influence peddling," [6] "illicit help in obtaining business in foreign countries," [7] "payoffs . . . to defraud the Pentagon," [8] "illegal commissions," [9] "illegal" or "improper" payments to foreign consultants, [10] "fraudulent billing on government contracts," [11] and improper acquisition of classified data [12] that form the basis of Longstaffe's allegations. In addition, they

4. Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Wall Street Journal, Nov. 5, 1993 (Waldman Decl., Exh. 80, p. 1); Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Asian Wall Street Journal, Nov. 8, 1993 (Waldman Decl., Exh. 81, p. 1).

5. Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Wall Street Journal, Nov. 5, 1993 (Waldman Decl., Exh. 80, p. 2); Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Asian Wall Street Journal, Nov. 8, 1993 (Waldman Decl., Exh. 81, p. 1).

6. Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Wall Street Journal, Nov. 5, 1993 (Waldman Decl., Exh. 80, p. 2); Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Asian Wall Street Journal, Nov. 8, 1993 (Waldman Decl., Exh. 81, p. 2).

7. Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Wall Street Journal, Nov. 5, 1993 (Waldman Decl., Exh. 80, p. 3); Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Asian Wall Street Journal, Nov. 8, 1993 (Waldman Decl., Exh. 81, p. 3).

8. Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Wall Street Journal, Nov. 5, 1993 (Waldman Decl., Exh. 80, p. 2); Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays*, The Asian Wall Street Journal, Nov. 8, 1993 (Waldman Decl., Exh. 81, p. 2); *see also* Andy Pasztor, *Litton Faces Probe of Repairs to Gyroscopes: Civil Whistle–Blower Suit Alleges Overcharging By Millions of Dollars*, The Wall Street Journal, Nov. 22, 1993 (Waldman Decl., Exh. 82, p. 1).

9. Andy Pasztor, *Litton Faces Probe of Repairs to Gyroscopes: Civil Whistle–Blower Suit Alleges Overcharging By Millions of Dollars*, The Wall Street Journal, Nov. 22, 1993 (Waldman Decl., Exh. 82, p. 3); *see also Litton Says in Compliance on Contracts*, Reuters, Nov. 22, 1993 (Waldman Decl., Exh. 84, p. 2); David B. Ottaway, *Saudi Court Case Raises Questions of Wide Corruption by Leadership*, The Washington Post, Jan. 2, 1996 (Waldman Decl., Exh. 88, p. 7).

10. E. Scott Reckard, *Defense Fraud Report Shoots Down Litton Stock*, The Associated Press, Nov. 22, 1993 (Waldman Decl., Exh. 83, p. 2); E. Scott Reckard, *Litton Criticized for Repairs*, The Associated Press, Nov. 23, 1993 (Waldman Decl., Exh. 85, p. 1); Ralph Vartabedian, *Litton Saudi Defense Project is Target of IRS Inquiry Probe*, Los Angeles Times, July 3, 1995 (Waldman Decl., Exh. 86, p. 1); Andy Pasztor, *Litton Comes Under Federal Inquiry Linked to Whistle–Blower Complaints*, The Wall Street Journal, July 5, 1995 (Waldman Decl., Exh. 87, p. 1); *Litton Raid*, City News Service, Mar. 27, 1996 (Waldman Decl., Exh. 89, p. 1); Aaron Curtiss & Ralph Vartabedian, *Federal Agents Raid Offices of Litton Industries*, Los Angeles Times, Mar. 28, 1996 (Waldman Decl., Exh. 90, p. 2); *see also* David B. Ottaway, *Saudi Court Case Raises Questions of Wide Corruption by Leadership*, The Washington Post, Jan. 2, 1996 (Waldman Decl., Exh. 88, p. 8).

11. Aaron Curtiss & Ralph Vartabedian, *Federal Agents Raid Offices of Litton Industries*, Los Angeles Times, Mar. 28, 1996 (Waldman Decl., Exh. 90, p. 1).

12. *See South Korea Probes Military Secrets Leaks Through Arms Dealers*, Agence France Presse, Apr. 22, 1997 (Waldman Decl., Exh.

focus on the specific foreign consultants and countries that are Longstaffe's primary examples of Litton's wrongdoing, including the Zimah Group of Saudi Arabia and the Posan Industrial Company of South Korea. (*Compare* Waldman Decl., Exhs. 80–98 *with* FAC, ¶¶ 25, 28.) Based on these articles, the Court finds that Longstaffe's allegations were publicly disclosed prior to the filing of his original Complaint, and that the first prong of the public disclosure bar has been met. While Longstaffe may have identified specific regulations that were allegedly violated, that detail adds little where the media coverage put the public on notice as to each of the broad categories within which Longstaffe's details fall. *See United States ex rel. Hansen v. Cargill, Inc.*, 107 F.Supp.2d 1172, 1181 (N.D.Cal.2000) (rejecting plaintiff's contention that the public disclosure bar did not apply because the details of the allegations had not been disclosed), *aff'd*, 26 Fed.Appx. 736 (9th Cir.

2002), *cert. denied*, 537 U.S. 1147, 123 S.Ct. 850, 154 L.Ed.2d 849 (2003). Plainly, the media coverage was more than enough to put the Government on the track of Litton, and that track would have inevitably led to categorization of the misdeeds by alleged regulation or statute. *See United States ex rel. Rosales v. San Francisco Housing Auth.*, 173 F.Supp.2d 987, 996 (N.D.Cal. 2001) ("Although all of the purported *means* by which the [Defendant's] fraud was perpetrated may not have been commonly known, the prior public disclosures contained enough information to enable the government to pursue an investigation into them. This is enough to trigger the jurisdictional bar").

In fact, there is evidence in the record that shows that the Government *was* on the track of Litton and had sufficient information to enable it to pursue an investigation into the allegations made by Longstaffe in the FAC.[13] Subpoenas from the

---

91); *Lt. Col. Arrested for Leaking Military Secrets to Arms Brokers*, The Korean Herald, Apr. 23, 1997 (Waldman Decl., Exh. 92); *South Korean Air Force Officer Arrested on Charges of Leaking Secrets to U.S. Company*, British Broadcasting Corporation, Apr. 25, 1997 (Waldman Decl., Exh. 93); *Caught Leaking Defense Secrets?*, Asia Times, Apr. 28, 1997 (Waldman Decl., Exh. 94); Kevin Sullivan, *S. Korea Arrests American on Charges of Espionage; Businessman Accused of Collecting Arms Data*, The Washington Post, May 1, 1997 (Waldman Decl., Exh. 95); Kevin Sullivan, *American Denies Spy Charges in Seoul; Lawyer Details Case Against Businessman*, The Washington Post, May 2, 1997 (Waldman Decl., Exh. 96); *General Is Ousted in Reported Leaks of Military Data*, Chicago Tribune, May 2, 1997 (Waldman Decl., Exh. 97); *One Jailed, U.S. Contractor Gets Suspended Term in S. Korean Secrets Trial*, Agence France Presse, July 25, 1997 (Waldman Decl., Exh. 98).

**13.** The situation here is therefore markedly different from *Wang v. FMC Corp.*, 975 F.2d 1412 (9th Cir.1992). In *Wang*, the plaintiff was attempting to prosecute four separate claims, and the fact that one claim had been disclosed did not defeat his ability to proceed

on the other three. Unlike the present case, where the allegations and nature of the transactions were duplicated by Litton from country to country and contract to contract across the spectrum of Litton products, Wang's charges were discrete and unrelated. The disclosed project related to the Bradley Fighting Vehicle, a tank. Allegedly, the tank had a problem with the teeth in its transmission gears, which FMC fixed but did not disclose to the Government. *Id.* at 1417. The undisclosed projects related to the Integrated Technology Tactical Vehicle Horsepower Estimation Project, the Submarine Weapon Handling System (" 'fatally defective due to the lack of engineering insight into the mathematical modeling requirements' "), and the Lightweight Towed Howitzer Demonstrator ("problems with 'composite' technology"). *Id.* It is inconceivable that the transmission problems with the Bradley Fighting Vehicle would have led the Government to investigate qualitatively different problems with howitzers and submarines. By way of contrast, the public allegations in this case—of bribery, influence peddling, and accounting measures used to carry out these activities at Litton— led the Government on an identical track to

Government investigation, submitted by Litton in support of its Motion, indicate that the Government sought out a wide range of information regarding Litton's overseas activities, including all documents pertaining to: (1) Litton's agreements and/or contracts with over one hundred foreign consultants and consulting groups (Waldman Decl., Exhs. 12, 31); (2) The payment of any monies, fees, or commissions by Litton to the "Litton Consultants" (*id.* at Exh. 31); (3) The payment of fees or commissions by Litton in order to obtain foreign sales or contracts (*id.* at Exh. 6, pp. 3–4); (4) Litton's policies and practices regarding payments to foreign consultants (*id.* at Exh. 3, p. 4); (5) Litton's "internal practices, procedures, policies or memoranda concerning the use and approval of marketing consultants" (*id.* at Exh. 1, p. 4); (6) Litton's lists and reports regarding foreign consultants, including all documents entitled "Status of Consultant Agreements" (*id.* at Exh. 9, p. 4); (7) Any and all checks, wire transfers, purchase orders, invoices, and consulting evaluations and/or profiles generated by Litton (*id.* at Exh. 11); (8) Litton's accounting records (*id.* at Exhs. 14–17) and internal audit reports (*id.* at Exh. 28); (9) Litton's Foreign Marketing Service Accounts, including documents "adjusting entries" of these accounts (*id.* at Exh. 6, p. 2; Exh. 10, p. 2); (10) Litton's Taiwanese consultant, T & P Company, and/or its President, Richard Hei (*id.* at Exhs. 1–5, 21, 30, 41–45); (11) Litton's business in South Korea and with the South Korean government (*id.* at Exhs. 32, 36, 68); and (12) Litton's contracts with the Government of Israel (*id.* at Exh. 54) and the Ministry of National Defense of Greece (*id.* at Exhs. 54, 63, 64, 70–73), including payments made to consultants in connection with these contracts.

question all of Litton's dealings, not simply those specifically disclosed in the press. *See*

· Of course, whether or not the Government was actually pursuing the allegations at issue in this case is irrelevant to the question of whether said allegations were "publicly disclosed" for purposes of the FCA. All that is required is a finding that the publicly disclosed allegations were sufficient to put the government on notice of the alleged FCA violations. *Harshman,* 197 F.3d at 1020. In other words, so long as "the evidence and information in the possession of the United States at the time the False Claims Act suit was brought was sufficient to enable [the Government] adequately to investigate the case and to make a decision whether to prosecute," the first prong in the Section 3730(e)(4) analysis is satisfied. *Horizon West, Inc.,* 265 F.3d at 1016, *citing United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1377 (D.C.Cir.1981). In this case, the Court finds that the allegations disclosed via the media, which "fairly characterize[ ]" Longstaffe's allegations, meet this standard. *Horizon West,* 265 F.3d at 1016.

Longstaffe argues that he has gone much farther than anything revealed by the media, allegedly identifying over four hundred questionable consultants. (FAC, ¶ 20 and Exh. 2.) He asserts that, if he is not able to pursue these transactions, no one will. This argument fails for two reasons. First, the scope of Litton's allegedly improper activities was publicly disclosed. The relevant press reports suggest that Litton's allegedly illegal dealings were not isolated to a couple of countries, but were wide-spread. In 1996, an unidentified senior federal law enforcement official told the Los Angeles Times, "We are trying to determine whether there is a broad practice that crosses lines of business." Aaron Curtiss & Ralph Vartabedian, *Federal Agents Raid Offices of Litton Industries,*

*supra* Part II(A)(1) (discussion of press coverage).

The Los Angeles Times, Mar. 28, 1996 (Waldman Decl., Exh. 90, p. 1). As early as 1993, the press reported that the investigation of Litton involved "four of its divisions." Andy Pasztor, Bruce Ingersoll, & Jeremy Mark, *Buying Business: Some Weapons Makers Are Said to Continue Illicit Foreign Outlays,* The Wall Street Journal, Nov. 5, 1993 (Waldman Decl., Exh. 80, p. 2). Thus, well before Longstaffe filed suit, there was more than suggestion in the press that the problems at Litton were endemic. Through his labors, Longstaffe has allegedly proved the press reports correct. The fact remains that the starting point was public disclosure within the meaning of the FCA.

Second, the fact that "money may be left on the table" if Longstaffe is not allowed to proceed is not a basis to ignore the jurisdictional limitations of the FCA. The FCA is a fundamental response to the fact that the Government does not have the resources to pursue all frauds perpetrated on the Government. But when Congress put limits on private suits through jurisdictional limitations, it necessarily knew that there would be a gap in the enforcement spectrum between claims that the Government would be able to pursue and the remaining meritorious claims, some of which a relator might be barred from pursuing because of a jurisdictional defect. Longstaffe's claims may be meritorious, but neither his zeal nor desire to supplement the Government's revenues can overcome the jurisdictional bar present here.

### 2. Original Source

Having found that Longstaffe's *qui tam* suit is based on publicly disclosed allegations, the Court now turns to whether he was "an original source" of such allegations. To qualify as an original source, Longstaffe must have: (1) "direct and independent knowledge of the information on which the allegations are based," 31 U.S.C.A. § 3730(e)(4)(B); (2) "voluntarily provided the information to the Government before filing" his action, *id.;* and (3) "had a hand in the public disclosure of allegations that are part of [his] suit," *Wang,* 975 F.2d at 1418; *accord United States ex rel. Devlin v. California,* 84 F.3d 358, 360 n. 3 (9th Cir.1996). The Court finds that, even if Longstaffe could meet the first two elements of the applicable test, he would not qualify as an "original source" because he did not have a hand in the public disclosure of the allegations at the heart of the FAC. There is no evidence that Longstaffe provided information to the media or triggered the Government investigation in 1992. Taking into account the factors set out by the Ninth Circuit in *Seal 1*—"(1) the degree to which the relator's information helped uncover the later allegations; (2) the degree to which other private actors helped uncover those allegations; (3) the degree to which the government played a role in uncovering those allegations; and (4) whether the later allegations are brought against the same entity as the earlier allegations"—the Court finds that Longstaffe played too insignificant a role in the public disclosure of the allegations in the FAC to qualify as an "original source." *See Seal 1,* 255 F.3d at 1163.

Litton's Motion to Dismiss for lack of subject matter jurisdiction is accordingly granted. Fed.R.Civ.P. 12(b)(1).

### B. 12(b)(6) Motion

In light of the above ruling, Litton's Motion to Dismiss the FAC for failure to plead fraud with particularity is rendered moot.

### III. Conclusion.

Based on the above, IT IS HEREBY ORDERED that Longstaffe's First Amended Complaint be DISMISSED for

lack of subject matter jurisdiction, Fed. R.Civ.P. 12(b)(1).

IT IS SO ORDERED.